# WICKERS *v.* McKEE.

PATENTS; INTERFERENCES; APPEALS; REDUCTION TO PRACTICE; TESTS; DILIGENCE.

1. This court will not reverse the concurrent successive decisions of the three tribunals of the Patent Office in an interference proceeding, except in a very clear case.

2. Where the object of an invention in issue in an interference proceeding is to produce a printing plate, the printing surface of which contains elevations and depressions corresponding with the tones of the imprint to be produced, so as to dispense with the "overlay" on the impression cylinder of the press, and so that, instead of putting the "make-ready" on the impression cylinder by means of the "overlay," such "make-ready" is put into the surface of the plate itself,—to be within the issue a plate must have been produced by the process described, in making which the make-ready was substantially dispensed with; and a demonstration by actual trial should be on power presses, and a clear showing made that the proper graduation of tone on the imprint could be obtained without "making-ready" or "overlaying" the impression cylinder; the test of successful reduction to practice of such an invention being a printing test under actual working conditions.

3. Complete invention must amount to demonstration. The efforts of the inventor must have passed beyond experiment, beyond the reach of possible or probable failure, must have attained certainty by embodiment in the intended form, and must be capable of producing the desired result; for where experiments have inspired hope of future achievement of the purpose for which they were designed, they still fall short of reduction to practice. (Following *Hunter* v. *Stikeman,* 13 App. D. C. 214; *McKenzie* v. *Cummings,* 24 App. D. C. 137; *Gilman* v. *Hinson,* 26 App. D. C. 409; and *O'Connell* v. *Schmidt,* 27 App. D. C. 77.)

4. Where invention belongs to a class requiring actual use or thorough tests to demonstrate its practicability, there can be no reduction to practice until one or the other thing happens and is proved. (Following *Gallagher* v. *Hien,* 25 App. D. C. 77.)

5. Mere business considerations, apart from circumstances of a compelling nature, will not excuse a lack of diligence in reducing to practice. (Following *Paul* v. *Hess,* 24 App. D. C. 462.)

6. Suffering long intervals of time to elapse between experiments and tests, although facilities are at hand to make them, tends to show want of diligence in reducing to practice.

7. Diligence excited by the knowledge that a rival has entered the field will be unavailing.

8. The question of the right of a party to make a claim may sometimes be an ancillary question, to be considered in awarding priority of invention. (Following *Podlesak* v. *McInnerney,* 26 App. D. C. 399.)

9. A contention by one of the parties to an interference involving an improvement in printing blocks, that the other party is not entitled to make the process claims forming counts of the interference, because he heats his plates as a step in his treatment, while such counts are silent as to the heating of the plate, has no merit, where the application of such other party contains claims which omit this step, thus showing that he does not consider his invention as so limited, and where it also appears that heating is no more essential to the process of one of the parties than to that of the other.

No. 386. Patent Appeals. Submitted November 24, 1906. Decided February 5, 1907.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Affirmed.*

The facts are stated in the opinion.

*Messrs Griffin & Bernhard* for the appellants.

*Mr. Walter F. Rogers* and *Mr. Jacob Felbel* for the appellee.

Mr. Justice McCOMAS delivered the opinion of the court:

The matter of this interference is improvement in manufacture of printing blocks, and the issue is as follows:

"1. A printing block having an uneven printing face or surface, parts of said printing surface being raised to correspond to the darkly shaded parts of the subject to be printed, and other

parts of its printed surface being depressed to correspond to the lighter shaded parts of the subject to be printed, the whole surface level of the block being a printing surface, but having uneven or facial differences in its plane.

"2. A printing surface having the sections thereof which are designed to print the darker shades permanently elevated above the levels of the sections adapted for the lighter shades.

"3. A printing surface having the sections thereof which are designed to print the darker shades permanently elevated above the levels of the sections adapted for the lighter shades, these levels being graded one into the other.

"4. A printing surface having sections thereof which are designed to print the darker shades permanently elevated above the levels of the sections adapted for the lighter shades, the levels being graded one into the other from the permanently elevated parts to the lighest printing shade.

"5. The herein-described process of producing printing surfaces, which consists, first, in forming a relief printing surface in a yielding material, and then producing a graded printing surface by applying different degrees of pressure to various sections thereof and so as to produce permanent graded alterations in the surface in profile.

"6. The herein-described process of producing printing surfaces, which consists in first forming a relief printing surface in a thin plate, and then applying different degrees of pressure to various sections thereof, thereby producing permanent differences in profile in said plate, the levels of which are in correspondence with the darkness of the shades to be printed by the sections."

The four applicants in this interference are Walter J. Wickers and Patrick M. Furlong, who filed their joint application January 22, 1902, and on August 23d of the same year, filed a divisional application; Milton A. McKee, who filed December 21, 1901; Eugen Albert, who filed June 15, 1901; and Burt F. Upham, who filed January 22, 1901. From the decision of the Commissioner of Patents, Wickers and Furlong alone appealed to this court.

The record in this case, which is Interference No. 22,400 in the Patent Office, contains 2,000 pages and nearly 200 exhibits. It is evident that the review of this case must be abridged so far as practicable. In succession, the three different tribunals of the Patent Office have agreed in their conclusions, and, as we have so often announced, this court will not reverse the unanimous decisions except in a very clear case. We have found nothing in this matter of interference which makes the case before us an exception to this rule. This case is one of a series of related interferences, in all of which the three tribunals of the Patent Office agreed in awarding priority to McKee. It was stipulated that the records and files of this case should be taken and considered to be parts of the transcripts of record in each of the other cases, respectively. The conclusion reached in the principal case before us enables us to make brief disposition of the interferences involved in the other cases.

The invention involved in these interferences relates to printing plates and methods of producing the same, and more particularly to such plates as are employed for printing illustrations; and the appellee argues the invention comprises a printing plate which may be an original engraved plate, line or half tone, or an electrotype, and processes for producing printing plates.

In the prior art, the metal relief printing plates were either "engraved plates," which were mechanically engraved, "half-tone plates," which were engraved by etching, and "electros," or electrotypes. The mechanically engraved plates are made by transferring an illustration to the face of a metallic plate by one method or another, and then cutting, by use of a graver's tool, the illustration in the plate. To produce half-tone plates, a negative of the chosen subject is made by photographing through a ruled screen, and a print or photographic transfer from such negative is made on the previously sensitized front of the printing plate. Because of the intervention of the screen in preparing the negative, this print has the "ruled" or "line" effect, the function of which effect is to cause the plate to take

up ink. When the sensitized surface is developed, the plate is "etched" by immersing it in a chemical bath. Plates produced by either the mechanical or photo-engraving method are termed "engraved plates," or "original plates." The part of the plate which is to produce the imprint or picture stands out in relief, while the non-printing portion of the surface is depressed. An original plate may be used for printing, but usually an electrotype made therefrom is employed. The "electro," the third class of the prior art, is made by pressing the original engraved plate face downward, in wax, thereby producing a mold or matrix, in which the impression of the printing surface is depressed, and the non-printing surface is in relief. This mold is dusted with graphite, thus making its surface a conductor of electricity; a shell of copper is then deposited thereon electrolytically, thereby producing a copper replica of the original plate. By whichever of the methods described it may be produced, the engraved plate or the electro made therefrom is backed up with electrotype metal, thereby producing a printing block suitable for use on a printing press. Upon all plates and electrotypes it is essential that the pressure exerted by the printing press at the moment of transferring ink to the surface of the paper shall be applied strongly on the parts of the surface of the plates which correspond to the solids or shadows or darker shades of the picture, and lightly upon those parts which correspond to the light or high lights of the picture.

In the prior art it has been the practice to take proofs from the plate in number corresponding with the printing tones of the plate, and then to make from these proofs a cut-overlay. This cut-overlay is made by first cutting out and discarding the lightest printing tones from one of the proofs, and what remains is the base sheet of the overlay, to which all other portions are attached. From the next proof, the lighter tones, and then the next lightest tones, are successively cut out and discarded, and so on until, in the last proof, all but the solids are cut out and discarded. These separate sheets are then pasted one upon the other, so that the greatest number of thicknesses of the cut-overlay will correspond and register with the solids or shadows of

the cut, while the lowest number, the thinnest portion, will correspond and register with the high lights of the cut. Indeed, the extreme high light is often represented by openings through the whole cut-overlay. The cut-overlay so formed is so graded by the pasting together of the different cut-out proof sheets that the thickest portions correspond with the more solid portions of the cut to be printed, and from these portions the overlay tapers down to nothing where the high lights are to be printed. This cut-overlay is placed upon the cylinder of the printing press so that, in printing, the overlay and cut will register so that where the greatest amount of printing pressure is required the thickest portion of the overlay will be opposite the solids of the cut, and so that where the least amount of pressure is required, opposite the high lights, the thinnest part will be in register.

The making and mounting of these cut-overlays upon the cylinder, with accompanying necessary details, consumes much time, and requires the service of expert mechanics with artistic sense.

All of the parties to this interference proceeded upon the idea of making the printing side of the plate highest where the solids or shadows exist, and gradually depressing the plate where the lighter tones are found, so that the varying pressures required may be accurately and aptly applied upon those parts of the plate which are to print darkest and upon those parts which are to print lightest, and by apt graduation upon the intermediate portions. The means employed on the platen or impression cylinder for pressing the paper at varying pressures against the flat printing plate is termed an "overlay." The making of the overlay and placing it on this cylinder is called "making-ready," and what results from the operation is called the "make-ready" of the press. By a "reverse overlay" is meant an overlay in which the thickest parts correspond to the high lights of the imprint, and the thinnest part to the darkest, the intermediate thicknesses being properly graded. A "reverse overlay" is never used on the back or reverse of the plate, but always on the face or obverse of the plate.

It is the object of the invention in issue to produce a print-ing plate the printing surface of which contains elevations and depressions corresponding with the tones of the imprint to be produced, so as to dispense with the overlay on the impression cylinder of the press, so that, instead of putting the "make-ready" on the impression cylinder by means of the "overlay," such "make-ready" is put into the printing surface of the plate itself. Such a plate has a graduated printed surface which pro-duces an imprint whereby the several tones of the illustration are secured by these graduations; whereas in the printing plate of the prior art, with the flat printing surface, the several tones were secured entirely by the overlay used on the impression cyl-inder. The Commissioner of Patents holds, accordingly, that a graduated printed surface within the meaning of these inter-ferences is a printing surface containing all the "make-ready" in its face. The appellant, however, contends that the issues of the interferences are not limited to a plate having a portion only of the "make-ready" on its face. This contention of the appellants is quite material to their case on this appeal.

Wickers and Furlong, in their application filed on January 22, 1902, disclosed two processes for producing the invention in issue. One process was to place an ordinary overlay on the back of the plate to be treated, so that the overlay registered with the face. The plate was then to be placed face downward upon wax or other semi-solid material, and pressed, and the pressure of the overlay against the back of the plate would cause corresponding graduations in its face. This process was transferred to a divisional application, upon a requirement of division by the Office, and it was this application which was filed by Wickers and Furlong August 23, 1902. The second process consists in etching the back of the plate so that the great-est amount of it is removed opposite the lightest part of the face, the full thickness of the plate being left under the darkest tone, and correspondingly graduating the various tones on other parts of the plate. The plate is then to be placed, face downward, on wax or other suitable material, and pressure is to be exerted, thereby transferring the graduations from the back of the plate

to its face. By both processes the printed surface of the plate is graduated, and, simultaneously, the wax into which the plate has been pressed receives an intaglio of the printing plate, and, of course, becomes a matrix, upon which an electrotype shell may be deposited.

Both these applications are involved in this interference, and Wickers and Furlong have their date of January 22, 1902, as the time of their constructive reduction to practice. The Examiner of Interferences decided that the testimony clearly established the fact that in 1897 Wickers and Furlong had a conception of the invention in issue and of a process for producing it, this process being substantially the same as the process disclosed in their application involved in the interference. The Examiners-in-Chief, however, concluded that Wickers and Furlong failed to prove prior conception, utterly failed to prove conception at any date in 1897, or at any time, in fact, prior to October, 1901. The Commissioner of Patents remarks that the Examiner of Interferences had found that Wickers and Furlong had a conception of the invention of all the interferences in August, 1897, while, as he observed, the Examiners-in-Chief had decided that in the present interference Wickers and Furlong had failed to prove their date of conception prior to October, 1901, and in the remaining interferences prior to their filing date, January 22, 1902. Therefore the Commissioner concluded that, in view of the fact that Wickers and Furlong in all of the interferences were the last to reduce to practice, and were unquestionably lacking in diligence, it was unnecessary to determine their date of conception of the invention. We have examined, but it is impossible to here review, the voluminous testimony and numerous exhibits related to the question of conception and early reduction to practice of this invention by Wickers and Furlong. Prior to 1897, and thereafter until 1902, Wickers had charge of the engraving department and Furlong was foreman of the electrotyping department in the establishment of the De Vinne Press, of New York City. Wickers says that in July, 1897, Furlong and he jointly conceived the invention in issue. Furlong says his employer, De Vinne, made

a suggestion concerning rounding edges on vignetted cuts and while he was experimenting with this he consulted Wickers, who suggested that, if it were possible to reduce the edges of vignetted cuts in electrotypes, it should also be possible to produce a graded surface over the entire face of the plate, giving each shade its proper tone. This incident occurred early in that year, and led to a series of experiments by Wickers, who consulted with Furlong in the endeavors to make such plates. Eighteen witnesses testified in behalf of Wickers and Furlong. Of these, Foster, Boyer, and Liecty more fully speak concerning many exhibits, as do Bloom and Hicks in less degree. Boyer was an electrotype molder. Foster molded more than fifty original plates for Wickers and Furlong, and Liecty was an electrotype finisher. The proof is quite convincing that Wickers and Furlong, and especially Wickers, made experiments from time to time; and, as some of the witnesses said, produced improved plates which were an aid to the pressman but did not do away entirely with the overlay. The press used in testing the experimental plates was a hand press. Both Wickers and Furlong testify to experiments during 1897 and the two following years. Among the first was that of placing a copper overlay, exhibited, on the back of a plate, also exhibited, in register with the face, and subjecting both to pressure; and the corresponding electrotype was in evidence; and in some degree two witnesses corroborate the production of certain plates; and Wickers claims to have disclosed the invention to various employees of the De Vinne Company. That all this testimony lacked definiteness, and that in essential features the case of Wickers and Furlong fell short of that complete invention which must amount to demonstration, is suggested by their attitude upon this appeal, wherein they contend that it is not necessary that the make-ready be entirely dispensed with, and that even a slight variation in the surface of the printing plate is a sufficient compliance with the requirements of the issue. At least, to be within the terms of the issue we are convinced that they must have produced a plate by the process described, in making which the make-ready was substantially dispensed with.

These issues require, as a reduction to practice of the invention, a construction of printing plates by the process claimed, having the characteristics described; and we are inclined to agree that the demonstration by actual trial should be on power presses and a clear showing that the proper graduation of tone on the imprint can be obtained without "making-ready" or "overlaying" the impression cylinder. Complete invention must amount to demonstration. The efforts of the inventor must have passed beyond experiment, beyond the reach of possible or probable failure, must have attained certainty by embodiment in the intended form, and must be capable of producing the desired result; for where experiments have inspired hope of future achievement of the purpose for which they were designed, they still fall short of reduction to practice; for the test of successful reduction to practice herein is the printing test under actual working conditions. See *Hunter* v. *Stikeman,* 13 App. D. C. 214; *McKenzie* v. *Cummings,* 24 App. D. C. 137; *Gilman* v. *Hinson,* 26 App. D. C. 409; *O'Connell* v. *Schmidt,* 27 App. D. C. 77.

The witness Murray testifies that the various Wickers and Furlong's exhibit proofs, produced by a hand press, are no fair test of the printing qualities of the plate, for such proof is produced at one given impression over the surface of the entire plate at one time, and consequently a proof thus produced cannot be compared with the impression from a power printing press, for the latter is extremely rigid on the impression, and the point of contact is on a small portion of the printed surface at any given time, it is on a line with the length of the cylinder, and is at no time over a quarter of an inch in width. Murray gives reasons why a hand-press proof shows up much better than one from the cylinder impression. We need not follow this and other witnesses who claim that an inventor who has confidence in anything he has done to a plate should not be satisfied until he has demonstrated that the plates are available in actual printing. This court has held that where invention belongs to a class requiring actual use or thorough tests to demonstrate its practicability, there can be no reduction to practice

until one or the other thing happens and is proved. *Gallagher* v. *Hien,* 25 App. D. C. 77. We are not satisfied that the proofs produced by Wickers and Furlong are evidence of the printing qualities of the plates.

We concur with the Examiners-in-Chief and the Commissioner that it is only by subjecting the plate produced by the process claimed to the printing test under the conditions of actual use that Wickers and Furlong can establish satisfactorily that such plate embodies the invention of this interference, and therefore the plate must be printed from, without the use of "cut-overlays." A flat plate with an overlay may produce the same imprint as a graduated plate, and to print from a plate with an overlay may make it uncertain that the plate itself has any graduation whatever. It is clear that some of the earlier plates of Wickers and Furlong lacked any perceptible graduation, and, in printing, the usual overlays were used on them. We concur, too, in the conclusion that, of the numerous plates put in evidence by Wickers and Furlong, it is not clear that any were made or printed from without overlays prior to the date of McKee's application,—December 21, 1901. Late in 1901 an electro made from a plate was used in printing page 486 of the Century Magazine, and there is a strong probability that the work was done without the use of an overlay on the impression cylinder. The appellants' witnesses insist this incident happened in October of that year, but at that time McKee had already reduced the invention to practice, and in December of that year filed his application.

There was remarkable lack of diligence on the part of Wickers and Furlong. Reckoning from the first experiment in August, 1897, there appear three intervals of about five or six months each, several intervals of three or four months each, and another still longer interval, until the spring of 1901, and another of six or seven months before the last of October, 1901. Wickers and Furlong, with every convenience at hand for reducing the invention to practice, experimented only at intervals of time wide apart, and the delay appeared to be due to business considerations and other distractions. As Justice Shepard

said in *Paul* v. *Hess,* 24 App. D. C. 462: "Even if properly supported and covering the entire period of delay, this excuse would be insufficient as not of the character required. It involves mere business considerations, and not circumstances of a compelling nature. Diligence will not wait on business arrangements." The appellants have failed to show that they were diligently engaged in reducing the invention to practice at the time their rivals entered the field. We are satisfied that in October, 1901, when McKee had reduced his invention to practice, and when Albert and Upham had filed their applications, there is not sufficient proof of Wickers and Furlong having done any serious work upon their problem for a long time prior to that date. Certain exhibits, it is true, were said to have been made in March and May, 1901, but the testimony is not convincing that these exhibits were made at that time. An original plate and an electrotype said by Wickers and Furlong to have been made at a prior date lacked the necessary confirmation of a disinterested witness. Whilst it appears that Wickers and Furlong did something with reference to the invention of the issue in February, 1900, there is a lack of corroborating testimony that the plates of 1900 and of the early part of 1901 were tested. Their conduct strongly indicates that they regarded these plates as unsuccessful experiments. They did nothing of consequence thereafter until October, 1901. We do not forget that they and their witnesses claim that intervals of delay never exceeded two months, but we are not convinced that the fact was so.

Both Wickers and Furlong held important places in the De Vinne printing establishment, where the Century Magazine, the St. Nicholas Magazine, and the books of the Century Company were printed. Workmen were nearby to prepare electrotypes, and on presses fitted to print illustrations of every kind they had ample facility for trying every phase of their ideas, for testing the feasibility of their invention. Beginning in 1897, we find their first substantial results clearly proved near the end of 1901. Appellants' counsel say that the only time they could devote to their experiments was chance hours which they

could spare from their responsible and absorbing duties. They say, too, that De Vinne paid little attention to their experiments, and was absorbed in other experimental work not related to the appellants' invention. Still it is true Wickers and Furlong suffered intervals to elapse without renewed efforts, although the facilities near at hand were so valuable.

Wickers testifies that from the experiments in midsummer of 1897 to the production of plates in the spring of 1898 their experiments were carried on intermittently, and he denies there were any intervals so long as six months, though sometimes several months elapsed without renewed experiment. Furlong is quite indefinite, saying that Wickers and he endeavored to produce graded surfaces on printing plates in the years just mentioned, and did produce pronounced graded surfaces in each of the three succeeding years, and he thinks also in 1902. Foster and Bloom say Wickers and Furlong worked at these plates at odd times, and Boyer states the plates were taken up at leisure times, and no interval exceeded two months.

In considering the proof of diligence, we have in mind the well-settled rule of the insufficiency of the uncorroborated testimony of sole or joint inventors. Since we agree with the Patent Office tribunals that they have failed to prove themselves to be the prior inventors, it is unimportant to consider whether when they failed they were or were not joint inventors. The Commissioner of Patents concludes that they have failed to establish that they actually reduced the invention to practice prior to their constructive reduction to practice by filing their application of January 22, 1902. Indeed, the Examiners-in-Chief hold that in the present interference Wickers and Furlong have failed to prove a date of conception prior to October, 1901, and in the remaining interferences prior to their filing date just mentioned.

In October, 1901, the activity of Wickers and Furlong is undisputed, and the result of their subsequent work soon led to a constructive and actual reduction to practice of the invention by them. We think, however, their diligence was excited by the knowledge of McKee's entry into this field. The record of

McKee is much clearer.  He testifies that he conceived this invention early in August, 1900, and on the 10th of that month he disclosed it to his friend Cates, then foreman of the pressroom of the "Farm Journal."  McKee then prepared a plate which was successfully used in printing the next regular edition of that journal.  This plate was introduced in evidence, and with it was exhibited a page of the Farm Journal which was printed from that plate, called the "Cates Plate."  Cates fully corroborated McKee, and testified that they printed from that plate without any make-ready on the impression cylinder.  That McKee's conception and reduction to practice in August, 1900, is fully established is too clear for argument, and the fact is not controverted by any of his opponents.  Even if McKee were not entitled to a date of conception earlier than his filing date of December 21, 1901, Wickers and Furlong must still fail because they failed to prove diligence.  But we agree with the Patent Office tribunals that in September and October, 1901, McKee made further reductions to practice.  His printing plates made at this period were planed in the works of the De Vinne press and in the department wherein Furlong was the manager.  McKee's testimony is further corroborated by Greenway and the two Cottrells.  After McKee's plates had been planed in Furlong's department McKee wrote a letter, which does not appear in evidence, and on October 15, 1901, Furlong wrote to McKee in the following terms:

Tuesday, P. M.,
Oct. 15, 1901.

My dear Mr. McKee:—

Some days since I was pleased at receiving your letter announcing the success of the new method of shaving electrotypes, and was delighted this a. m. on receiving convincing proofs from the plates.

You deserve much credit for the novel method, which is new to me, and in justice to you state I told Mr. Cottrell that I did not believe overlays on the plates while being shaved would

produce the desired result because the electrotypes are not sufficiently yielding, but am glad to know I was mistaken.

I am having some overlays—reverse overlays made here and will write you the result.

The delay in shipping last order of electrotypes was caused by carrying out the rule of this office, which is, 'All outside electrotyping is subject to the convenience of Century work'— we are very busy here at present.

Hoping to see more samples of your printing by the new method, and expecting a visit from you previous to returning to Philadelphia,

I remain yours,

P. M. Furlong.

Nor can it be doubted that the object of these inventions of McKee was, in substance, to do away with making-ready. McKee's specification thus states his method of producing a plate:

"The main object of my invention is to dispense entirely with the work of 'making ready' or of 'underlaying' and 'overlaying,' and to make the necessary corrections (or cure the defects) in the plates themselves, and so, that after treatment of the plates they may be placed on the press and the printing directly proceeded with.

\*    \*    \*    \*    \*    \*    \*

"So far as my knowledge extends, no printing plates of this description has ever before been produced, and in consequence of my improvements in the plate it will be seen that all the objectionable, expensive, and difficult work of 'making-ready' may now be entirely dispensed with, although I may add here that after the making of the plate,—the pressman should at any time during the course of the printing therefrom desire to change the character of impressions by further lightening or increasing the same he may for such purpose 'underlay' or 'overlay' in the usual manner, but ordinarily the plates may be made at the outset to conform exactly to what is required by the pressman, or to what is demanded by the nature of the plate to be worked from.

"In so far as certain features of my improvements in the art of treating or manipulating the plate are concerned, it will be understood that I do not wish to be limited to each and all of the steps of the complete process to which I prefer to subject the plate, for some of such steps may be used without others, or in connection with still other steps or modes of treatment to produce certain of the results produced by me, and to avoid either in whole or in part the work of 'underlaying' and 'overlaying.' "

The proof of McKee's reductions to practice show that he substantially dispensed with the make-ready, and the demonstration of his success in actual trial on power presses was immediate and beyond dispute.

In respect to the claim of Wickers and Furlong we concur with all the tribunals of the Patent Office, that McKee was undoubtedly the prior inventor. Wickers and Furlong contend that McKee had no right to make certain claims forming counts of the issues of these interferences. The Examiners-in-Chief, however, refused to make the desired recommendation under Rule 126, for which appellant's counsel ask. In *Podlesak* v. *McInnerney,* 26 App. D. C. 399, this court has held that the question of the right of a party to make a claim may sometimes be an ancillary question to be considered in awarding priority of invention, and there are good reasons why the question of the right to make the claims may be considered a basis for an award of priority, rather than a ground for a dissolution of an interference; and the Commissioner of Patents in his decision says that the right of McKee to make these certain claims questioned by Wickers and Furlong will later be given consideration in the Office as ancillary to the question of priority.

The Commissioner further says that Wickers and Furlong's contention is that McKee is not entitled to make the claims 5 and 6 of the present interference, "for the reason that his specification does not describe nor does his testimony show the steps of forming a relief printing surface in a "yielding material," and the Commissioner holds, for reasons well stated, that there is no merit in this contention. The appellants fur-

ther contend that McKee cannot make the process claims form-
ing counts of this or the companion interferences, because he
heats his plate as a step in his treatment, and these counts are
silent as to the heating of the plate. Of course, the purpose of
the heat is to soften the plate and permit the work to be ac-
complished with less pressure. We agree with the Commission-
er that heating is no more essential to McKee's process than to
the process of Wickers and Furlong, and that it may be omitted
if greater pressure be applied. McKee himself does not consid-
er his invention as limited to a process including heating, for
his application as filed contained claims which omitted this step.

From the decision of the Examiner of Interferences Wickers
and Furlong alone appealed. Upon the issue of this interfer-
ence the Examiner of Interferences decided that Upham con-
ceived the invention in 1899, but did not reduce the invention
to practice prior to the filing of his application, on January 22,
1901. He was not diligent at the time of McKee's conception
and reduction to practice in August, 1900, and therefore was
not entitled to prevail over McKee. The Examiner of Inter-
ferences also held that since Albert had taken no testimony he
was restricted to his record date; that, even if he were given
the benefit of his alleged foreign patents, the earliest date to
which he would be entitled for conception would be the date of
his earliest foreign patent, which was April 16, 1901. This
date would avail him no more than the date of his application
involved in this interference, which was June 13, 1901. It was
held, therefore, that Albert was not entitled to prevail over
either Upham or McKee. At this stage Albert and Upham dis-
appeared from further consideration upon this issue, and as
we concur with the three tribunals of the Patent Office that
McKee is the prior inventor as to the issues of this interference,
the decision of the Commissioner of Patents is affirmed, and
the clerk of this court will certify this opinion and decision to
the Commissioner of Patents in accordance with law.

                                        *Affirmed.*

A petition by the appellants for a rehearing, filed February
25, 1907, was denied March 6, 1907.