498 F.2d 271
 183 U.S.P.Q. 65
 In re YARN PROCESSING PATENT VALIDITY LITIGATION.
SAUQUOIT FIBERS COMPANY, Plaintiff-Appellee,
v.
LEESONA CORPORATION et al., Defendants-Appellants.
KAYSER-ROTH CORPORATION (in its own name and d/b/a
Kayser-Roth Hosiery Companyand Kayser-Roth Hosiery
Co., Inc.), Plaintiff-Appellee,
v.
LEESONA CORPORATION, Defendant-Appellant.
LEESONA CORPORATION, Plaintiff-Appellant,
v.
The DUPLAN CORPORATION et al., Defendants-Appellees.
 No. 73-2420.
 United States Court of Appeals, Fifth Circuit.
 July 29, 1974.
 
 Willis H. Flick, Miami, Fla., James H. Wallace, Jr., Nolan E. Clark, Washington, D.C., Robert F. Conrad, Ft. Lauderdale, Fla., William Schultz, New York City, for Leesona Corp.
 L. A. Schroeder, Miami, Fla., for Warren Seem.
 James L. Armstrong, III, James W. Crabtree, Miami, Fla., John J. McAleese, Jr., Plymouth Meeting, Pa., for Permatwist Co. et al.
 William W. Beckett, Washington, D.C., Richard G. Schneider, Philadelphia, Pa., Henry Burnett, Miami, Fla., for Sauquoit Fibers Co.
 Anthony F. Phillips, New York City, William K. West, John W. Malley, Washington, D.C., Paul B. Bell, Charles B. Park, Charlotte, N.C., for Duplan Corp. and Kayser-Roth Corp. et al.
 David Klingsberg, New York City, Hugh Latimer, Washington, D.C., for Kayser-Roth Corp. et al.
 Edward S. Irons, Mary Ellen Sears, Washington, D.C., for Celanese Co. and Fiber Industries, Inc., amicus curiae.
 Before JONES, THORNBERRY and COLEMAN, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 The principal issue in this consolidated litigation is the validity of U.S. Patents numbered 2,803,105, 2,803,108 and 2,803,109, collectively called the 'false twist' or 'single heater' patents, which are presently owned by Leesona. The patents disclose both an apparatus and an efficient, economical means of texturizing synthetic thermoplastic yarns. The teachings of the patents laid the technological foundation for the development of double-knit fabrics. On a motion for summary judgment the district court, 360 F.Supp. 74, held the patents invalid. We find that there existed genuine issues of material fact which should have precluded summary judgment and therefore reverse.
 
 
 2
 The applications for these patents culminated many years of work on the part of the inventors, Nicholas J. Stoddard and Warren A. Seem. The man had extensive experience in the throwing industry, which is the business of processing yards consisting of continuous filament fibers. They conducted their first joint experiments in the mid-1930's, when Stoddard was working under Seem at the Georgetown Silk Company. They were separated in 1938 by Stoddard's promotion and transfer to another plant, although they continued to communicate. They were reunited in Philadelphia in 1944, where they resumed their experiments and formed a loose partnership between themselves as inventors and two others who acted as financiers, Fred Tecce and Harold Berger. Those loose arrangement was later formalized as the Permatwist Company, a partnership registered to do business in Pennsylvania.
 
 
 3
 With the financial support of Tecce and Berger, the inventors were able to construct and operate two successive bench models in 1944 and 1947. Experimentation with the latter model continued for several years. Then in 1950 Berger and Tecce purchased a throwing mill called Marionette Mills in South Coatsville, Pennsylvania, and the inventors moved their equipment from their basements to an enclosed space in the Marionette Mills plant. Seem and Stoddard then borrowed a forty-spindle demonstration model Fletcher uptwister, moved it to the plant, and converted ten of the spindle positions to single heater false twisters, completing the conversion in July, 1950. They experimented with this model until November, 1950, when they restored it to its original condition and returned it to its owner.
 
 
 4
 Based on their experience with the 1950 model, the Permatwist partners decided to build eight full-sized machines and operate them in a basement that was to be dug under the Marionette Mills plant. When it developed that sufficient supplies of nylon yarn would not be available, the partners decided to build only one machine instead. In early 1951 they began converting a 220-spindle Atwood uptwister, completing the job early in 1952. The machine was installed in the Marionette Mills basement and operated in secret.
 
 
 5
 On May 20, 1952, four representatives of Synfoam Yarns, Inc., visited the Marionette Mills plant and, after signing agreements not to divulge what they saw, were shown the 220-spindle machine in operation. After a few months of negotiations, Permatwist and Synfoam entered into an agreement on December 15, 1952, granting Synfoam a license to use the false twist process. More than a year later, on January 4, 1954, Seem and Stoddard filed applications for the patents in issue. On December 14, 1954, Leesona acquired the patent applications from the Permatwist Company, and the patents themselves issued on August 20, 1957.
 
 The Four Phase Model
 
 6
 The points of American and Canadian patent law presented here are not altogether unambiguous. As an invention passes through different stages of development, from initial concept through patenting, the legal rights and duties of the inventor change. Although there exist legal terms of art to describe the various phases in the chronological development of an invention, their usefulness for analysis has been diminished both by their somewhat inconsistent application in the cases and by the secondary meanings and connotations they have acquired through long usage. Since we must not only analyze the American law but also compare it to Canadian, we find it useful to start by establishing a simple four phase model generally describing, in nonlegal terms, the relevant steps in the development of a typical invention.[1] We stress that we use this model for heuristic purposes only: we do not intend to create more legal doctrine but only to analyze existing doctrine as clearly as possible.
 
 
 7
 The earliest phase in the development of any invention is its mental conceptualization by the inventor, the time when the idea first dawns. This is typically followed in short order by the second phase, in which the inventor attempts to embody his idea in a working model or prototype. Phase two ends when he has succeeded in rendering his idea a reality by constructing a working model that substantially embodies the claims later to be patented. Then begins the third phase, in which the inventor experiments with his model so as to satisfy himself that it needs no further refinement and to prove its fitness for the intended purpose. Once this is completed the inventor is free to initiate the last phase of concern to us, in which he secures a limited legal monopoly to himself under the patent laws. This last phase is initiated by his application for the patent and terminates when the patent is finally issued. This is the general factual context of the legal issues before us.
 
 The Canadian Litigation
 
 8
 The Canadian counterparts of the patents under review were attacked in the Exchequer Court of Canada by Drnest Scragg & Sons Limited. Scragg suought a declaration that Leesona's Canadian patents were invalid and also a declaration that Scragg's 'Crimp Spin' machine and its use in the processing of textile yarns did not infrings any of Leesona's rights under the patents. Leesona denied Scragg's claims and counterclaimed for a declaration of validity and infringement, an injunction restraining the infringement and damages or an account of profits.
 
 
 9
 That suit was tried before President Thorson of the Exchequer Court. His approach was first to determine the precise extent of the monoploy granted gy the patents, a task which involved a careful construction of their claims. He explained the principles of construction of the claims of a Canadian patent as follows.
 
 
 10
 It is a cardinal principle that the claims in a patent should be construed in the light of the common knowledge which a person skilled in the art to which the invention defined in the claims relates is assumed to have had as (of) the date of the invention for which the patent was granted, for the specification of the patent, including the claims with which it ends, is deemed to be addressed to such a person.
 
 
 11
 The state of the relevant art immediately prior to the date of the invention is part of the common knowledge which the addressee of the patent is assumed to have had. It is important, therefore, that the date of the invention should be determined.
 
 
 12
 President Thorson then proceeded to discuss the term 'date of invention' as used in Canadian patent litigation. One definition was offered by Viscount Cave L.C. in The Permutit Company v. Borrowman, 1926, 43 R.P.C. 356, 359:
 
 
 13
 It is not enough for a man to say that an idea floated through his brain; he must at least have reduced it to a definite and practical shape before he can be said to have invented a process.
 
 
 14
 In Christiani & Nielsen v. Rice, 1930 S.C.R. 444, the Supreme Court of Canada states that
 
 
 15
 by the date of discovery of the invention is meant the date at which the inventor can prove he has first formulated, either in writing or verbally, a description which affords the means of making that which is invented. There is no necessity of a disclosure to the public.
 
 
 16
 Id. at 456. President Thorson then explained the term more fully.
 
 
 17
 It was not intended, in my opinion, that the test laid down in (Christiani) should be all-inclusive. It is clear, of course, that if an inventor can prove that he formulated a description of his invention, either in writing or verbally, at a certain date then he must have made the invention at least as early as that date. It is also clear that the requirement that there must be proof of the formulation of a description of the invention, either in writing or verbally, is neither apt nor necessary in the case of an invention of an apparatus where the inventor can prove that at the asserted date he had actually made the apparatus itself, although there was no formulation of a written or oral description of it. Nor was it intended that the test laid down in the statement should replace the genreal statement in the Permutit v. Borrowman case (supra) that before a man can be said to have invented a process he must have reduced the idea of it to a definite and practical shape. Consequently, even although the test of proof of the formulation of a description of the invention, either in writing or verbally, at a particular date might be appropriate in determining the date of an invention of a process, it cannot have been intended to exclude proof that the process was actually used at the asserted date, even although there was no formulation of a written or oral description of it at such date. Thus the statement in the Christiani v. Rice case (supra) to which I have referred should not be interpreted as laying down a rule that proof that an invention was made at an asserted date must be confined to evidence that a written or oral description of it had been formulated at such date. It may also be proved, in the case of an invention of an apparatus, that the apparatus was made at such date or, in the case of an invention of a process, that the process was used by such date. The essential fact ot be proved is that at the asserted date the invention was no longer merely an idea that floated through the inventor's brain but had been reduced to a definite and practical shape.
 
 
 18
 It seems that this definition establishes that the date of invention under Canadian law occurs no later than the end of phase two of our model, at which point a working prototype of the invention is in existence. Under Christiani & Nielsen v. Rice, supra, the date of invention can occur even earlier, perhaps even in phase one when the inventor is merely conceptualizing the invention, if the inventor can prove he formulated a verbal or written description of the invention before he himself had completed a working prototype. The date of invention is the day the invention is first reduced to definite and practical shape, notwithstanding the fact that further experimentaion and testing may be necessary before the inventor is ready to apply for a patent. Thus the date of invention must occur prior to the start of phase three of our model. Indeed, after determining that Permatwist had established a date of invention of either July or early August of 1947 for the apparatus in question,[2] President Thorson went on to point out specifically that 'the fact that Mr. Seem and Mr. Stoddard continued to work on Exhibit Z-151 and its accompanying equipment and make further experiments does not affect the fact that they had made the invention of the apparatus . . . at the asserted date.'
 
 
 19
 Having determined the relevant dates of invention, President Thorson proceeded to construe the claims of the patents in light of the state of the art on those dates and uphold the validity of the Canadian patents against claims of lack of novelty, lack of utility, and obviousness. After disposing of other issues he ruled in favor of Leesona and against Scragg in all things.
 
 Proceedings Below
 
 20
 In the present suit the validity of Leesona's American patents is attacked under 35 U.S.C.A. 102(b), which provides that
 
 
 21
 A person shall be entitled to a patent unless . . . (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . ..
 
 
 22
 Under this section, a single public use or sale prior to the 'critical date,' i.e., one year before the application for a patent, will result in an invalid patent. Egbert v. Lippmann, 1881, 104 U.S. 333, 26 L.Ed. 755; Minnesota Mining and Manufacturing Co. v. Kent Industries, Inc., 6 Cir. 1969, 409 F.2d 99. Even if no delivery is made, the existence of sales contract plus the reduction of the invention to a reality in the sense that it is beyond the stage of experimentation constitutes the placing 'on sale' required by the statute. Hobbs v. United States Atomic Energy Commission, 5 Cir. 1971, 451 F.2d 849. Public use may be established either by showing a nonsecret, nonexperimental use of the invention prior to the critical date, Pennock v. Dialogue, 1829, 27 U.S. (2 Pet.) 1, 7 L.Ed. 327; Smith & Griggs Manufacturing Co. v. Sprague, 1887, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141, or by establishing that the inventor himself has used the invention primarily for trade and profit prior to the critical date, whether the use is secret or not, Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 2 Cir. 1946, 153 F.2d 516, cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615; Huszar v. Cincinnati Chemical Works, 6 Cir. 1949, 172 F.,2d 6. Thus, under certain circumstances a single instance of competitive exploitation of the invention by the inventor prior to the critical date can raise both the 'on sale' and 'in public use' bars to patentability.
 
 
 23
 Notwithstanding the existence of facts sufficient to raise either of these bars, a patent is valid if the public use or sale was primarily for the purpose of experimentation. The Supreme Court's statement of this rule in 1878 is still the law today.
 
 
 24
 The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as (a public) use.
 
 
 25
 City of Elizabeth v. American Nicholson Pavement Co., 1878, 97 U.S. 126, 134, 24 L.Ed. 1000, 1004. A bona fide experimental use does not place the invention in public use within the meaning of the statute even though the invention on experiment proves complete and requires no modification or change. Id. Similarly a sale of the invention primarily for experimental purposes, to enable the inventor to determine whether the invention is complete, does not place the invention 'on sale' within the meaning of the statute. Adams v. Columbus Manufacturing Co., M.D.Ga.1960, 180 F.Supp. 921. If the use of the invention is primarily for experimental purposes, the fact that profits are made will not raise any bar to patentability.
 
 
 26
 A use by the inventor, for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principle, and not the incident, must give character to its use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for the purposes of experiment.
 
 
 27
 Smith & Griggs Manufacturing Co. v. Sprague, 1887, 123 U.S. 249, 256, 8 S.Ct. 122, 126, 31 L.Ed. 141; Pickering v. Holman, 9 Cir. 1972, 459 F.2d 403. Whether a use is primarily for the purpose of experimentation is primarily a matter of the inventor's intent. 'The use ceases to be experimental when the motivation of the inventor is to exploit the invention and gain a competitive advantage over others.' Solo Cup Co. v. Paper Machinery Copr., E.D.Wis.1965, 240 F.Supp. 126, 131, modified on other grounds, 7 Cir. 1966, 359 F.2d 754. See generally, 2 Deller's Walker on Patents, 145, 147 (2d ed. 1964).
 
 
 28
 In response to motions for summary judgment alleging that the inventions had been in public use and on sale prior to the critical date, Leesona filed a long memorandum in opposition which included, as required by Local Rule 10(J)(2),[3] a short statement of eleven material facts regarding which Leesona asserted there were genuine issues requiring a trial. The district court ruled that Leesona's response did not directly controvert any of the facts alleged by the movants to have been established and therefore deemed those facts admitted under the local rule. The crucial facts deemed admitted were numbers seven throgh twelve, which described the Synfoam license agreement. The district court regarded the admitted facts relating to the Synfoam license as sufficient to justify the conclusion that the invention embodied in the patents was on sale prior to the critical date. Similarly the court held that the commercialization of the invention by execution of the license established a use by the inventor for trade or profit sufficient to raise the 'in public use' bar to patentability under Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., supra.
 
 
 29
 Thus the resolution of the summary judgment motions came down finally to the issue of experimental use. In holding that the expedrimental stage had ended prior to the signing of the Synfoam license the district court relied heavily on the positions taken by Leesona in the Canadian litigation and the findings of President Thorson. The court noted that it had been to Leesona's advantage to establish as early a date of invention as possible in the Canadian litigation, and it held that Leesona was collaterally estopped to retreat from its previous position by arguing that the experimental stage of the invention lasted until after the critical date, January 4, 1953. Therefore the court held that the experimental use exception did not apply and that the patents were invalid because they were on sale and in public use prior to the critical date.
 
 Estoppel
 
 30
 There is some dispute between the parties as to the applicability of the doctrine of collateral estoppel in these circumstances. The doctrine, as applied by the district court, holds that
 
 
 31
 where there is a second action between parties, or their privies, who are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause, or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended.
 
 
 32
 1B Moore's Federal Practice, P0.441(2) (2d ed. 1974). Despite the lack of privity between Scragg and any of the appellees here, the court found the doctrine applicable under Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 1971, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788.
 
 
 33
 Leesona argues that collateral estoppel is inapplicable because the requirements of Blonder-Tongue are not met here. Appellees reply that Leesona should in any case be estopped to change its position by the doctrine of judicial estoppel, which precludes a party from advocating a position inconsistent with one previously taken with respect to the same facts in an earlier litigation, citing 1B Moore's Federal Practice, P0.405(8). We need not resolve this question, since it is clear that any form of estoppel at least requires an attempted change of position with regard to the same issue, legal or factual, that was previously argued or decided. Our holding that the issue here differs from the issue before the Exchequer Court precludes the application of any type of estoppel.
 
 
 34
 The district court's misapprehension of the issues decided in the Canadian litigation is clear. The district court stated flatly, 'The determination made by the Canadian Court concerning the date of invention and the date of reduction to practice was necessary for that judgment-- the dates were both in issue and controverted.' President Thorson, however, was careful to distinguish the issue before him from the American patent concept of reduction to practice: 'It is settled that in Canada the determination (of the date of invention) does not depend on the date of the reduction of the invention to practice in the sense of the United States decisions on the subject and they must, therefore, be read with caution.' Assuming that the district court was correct in equating the date of reduction to practice with the end of the experimental period under 102(b),[4] that date was explicitly not decided by President Thorson. It was error for the district court to rely on either findings or arguments in the Canadian case, since they went to the wholly different issue of the date of invention under Canadian law.
 
 
 35
 The difference between the two can be illustrated by reference to our four phase model. The Canadian 'date of invention,' as noted above, occurs no later than the end of phase two, when the invention is fully embodied in a working model or prototype. The American 'reduction to practice,' however, is not achieved until the inventor has sufficiently tested the prototype to prove its utility and to determine that no further refinements are necessary. In our model, this is testing in phase three. Consequently, reduction to practice must occur later in time than the date of invention.[5] The two dates being necessarily different, Leesona cannot be 'estopped' to make its argument regarding the end of the experimental stage either by its previous argument or by the Exchequer Court's decision regarding the date of invention.
 
 
 36
 While the difference between the two issues is easily conceptualized by using our four phase model, the legal framework is confusing, primarily as a result of inconsistent judicial definitions of 'reduction to practice.' This confusion may have misled the district court, and it has provided both sides in this case with precedent to support their opposing positions. Despite the confusion we find very little actual conflict in the cases.
 
 
 37
 In layman's terms, 'reduction to practice' connotes the initial construction of a working model of a new invention. Indeed, one definition of 'reduction' is 'transformation into objective form or reality,' as in 'reduction of the device to practice.' Webster's Third New International Dictionary. Therefore the lay understanding of the term would place the reduction to practice exactly at the end of phase two of our model. As a legal term of art, however, 'reduction to practice' includes not only this reduction to reality but also sufficient testing or experimentation to demonstrate that the device as it exists possesses sufficient utility to justify a patent, i.e., that the invention is suitable for its intended purpose. Voisinet v. Coglianese, Cust. & Pat.App.1972, 455 F.2d 1064; Elmore v. Schmitt, 1960,278 F.2d 510, 47 CCPA 960; Konet v. Haskins, 1950, 179 F.2d 1003, 37 CCPA 913. Mere construction of the device, which is sufficient to bring phase two to a close, does not reduce it to practice unless it is so simple that satisfactory operation is obvious. Gordon v. Hubbard, 1965, 347 F.2d 1001, 52 CCPA 1598.
 
 
 38
 'The efforts of the inventor must have passed beyond experiment, beyond the reach of possible or probable failure, must have attained certainty by embodiment in the intended form, and must be capable of producing the desired result; for where experiments have inspired hope of future achievement of the purpose for which they were designed, they still fall short of reduction to practice * * *.' Wickers v. McKee, 1907, 29 App.D.C. 4, 13.
 
 
 39
 The 'invention * * * (must have) * * * been tested so far as to make sure that it will operate under service conditions. * * * (A) test under service conditions is necessary in those cases, and in those only, in which persons qualified in the art would require such a test before they were willing to manufacture and sell the invention, as it stands. * * *' Sinko Tool & Manufacturing Co. v. Automatic Devices Corp., 2 Cir., 1946, 157 F.2d 974, 977.
 
 
 40
 'While it is true that reduction to practice does not require a device embodying the invention to be mechanically perfect, or a commercial success, its practical efficacy and utility must be demonstrated. * * *' Van Auken v. Cummings, 1931, 49 F.2d 490, 492, 18 C.C.P.A., Patents, 1250.
 
 
 41
 'Actual performance is required of the function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful. * * *' Field v. Knowles, 1950, 183 F.2d 593, 601, 37 C.C.P.A., Patents, 1211.
 
 
 42
 Radio Corporation of America v. International Standard Electric Corp., 3 Cir. 1956, 232 F.2d 726, 730 n. 9. See generally 1 Deller's Walker on Patents, 46 (2d ed. 1964) 69 C.J.S. Patents 87 (1951).
 
 
 43
 Thus the legal definition of the date of reduction to practice appears to equate it precisely with the end of the experimental period for purposes of 102(b). At least one commentator has clearly equated the two.
 
 
 44
 The law on experimental use has developed mainly from the diverse jurisdictions in infringement cases and has had less than homogeneous treatment. It is safe to say, therefore, that not all courts will recognize that the determination that a public use is excused as experimental depends upon a finding that there has not been at that point an actual reduction to practice of the claimed invention. Nonetheless, no other reasonable basis for the determination exists in the light of the patent statute.
 
 
 45
 Kayton, This Year (1966) In Patent Law, 35 Geo.Wash.L.Rev. 720, 727 (1967). The purpose of the experimental exception to 102(b) is to allow the inventor sufficient time to perfect his invention. City of Elizabeth v. American Nicholson Pavement Co., 1878, 97 U.S. 126, 24 L.Ed. 1000. An invention is 'perfected' for purposes of patentability once it has been reduced to practice by sufficient testing and experimentation to demonstrate its utility. At that point, then, further experimentation is not necessary before applying for a patent, and it would seem that the experimental period should end. There is support in the cases for such a view. See, e.g., Sperry Rand Corp. v. Bell Telephone Laboratories, Inc., S.D.N.Y. 1962, 208 F.Supp. 598, appeal dismissed, 2 Cir. 1963, 317 F.2d 491; Minnesota Mining & Manufacturing Co. v. Kent Industries, Inc., E.D.Mich.1967, 274 F.Supp. 993, aff'd, 6 Cir. 1969, 409 F.2d 99; Cali v. Eastern Air Lines, Inc., E.D.N.Y.1970, 318 F.Supp. 474, rev'd, 2 Cir. 1971, 442 F.2d 65; Kraus v. Emhart Corp., N.D.Cal.1970, 320 F.Supp. 60.
 
 
 46
 Numerous cases, however, have explicitly extended the experimental period past the point of reduction to practice. In General Motors Corp. v. Bendix Aviation Corp., N.D.Ind.1954, 123 F.Supp. 506, the court upheld an experimental use argument despite prior reduction to practice.
 
 
 47
 The courts have observed that there is a great deal of difference between the requirements of a reduction to practice and the requirements made in the automobile industry for a commercially practical device, Thompson v. Murray, 1936, 84 F.2d 202, 23 C.C.P.A., Patents, 1281, and that experiments may continue in an attempt to further perfect the device beyond the requirements of a reduction to practice. Ibid. It was stated in Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 1937, 92 F.2d 330, 336:
 
 
 48
 'So long as use by the inventor can fairly be considered experimental and collateral to the development of the invention in its complete form, the bar of the statute does begin to run. Reo Motor Car Co. v. Gear Grinding Mach. Co., 6 Cir., 42 F.2d 956, 968. The emphasis that is laid upon Gulick's use of a car with experimental pistons for business and pleasure for a considerable period does not impress us. Road tests of many thousands of miles are considered necessary to determine the efficiency of an engine and its parts. That such transportation is not wasted does not of itself constitute a public use.' There is no consistency in the fact that even though Jorgensens successfully reduced to practice the automatic choke in question, they continued to experiment with it in the hope of 'demonstrating its utility.' Therefore, it is concluded that the plaintiff is not barred because of any public use of the invention . . ..
 
 
 49
 Id. at 520. Similarly, in Cataphote Corp. v. De Soto Chemical Coatings, Inc., N.D.Cal.1964, 235 F.Supp. 936, aff'd, 9 Cir. 1966, 356 F.2d 24, the court said that
 
 
 50
 the test for establishing a reduction to practice is different than the test for establishing an experimental use. To establish a reduction to practice of the inventor's idea, there must be a demonstration that the inventor's idea works; in other words, that the invention will perform in a manner which will accomplish its intended purpose. RCA v. International Standard Elec. Corp., 232 F.2d 726, 730 (3rd Cir. 1956). To establish an experimental use, there must be a demonstration that the use was substantially for the purpose of experiment. Smith & Griggs Mfg. Co. v. Sprague, supra, 123 U.S. at 256, 8 S.Ct. 122. Thus, there may be an experimental use even following reduction to practice where the experiments are part of an attempt to further refine the device.
 
 
 51
 Id. at 934. Accord, Atlas v. Eastern Air Lines, Inc., 1 Cir. 1962, 311 F.2d 156, cert. denied, 1963, 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199; Solo Cup Co. v. Paper Machinery Corp., E.D.Wis.1965, 240 F.Supp. 126, modified on other grounds, 7 Cir. 1966, 359 F.2d 754; Hunt Industries, Inc. v. Fibra Boats, Inc., S.D.Fla.1969, 299 F.Supp. 1145.
 
 
 52
 This apparent conflict stems primarily from the differing definitions of 'reduction to practice' being applied. The cases are in substantial agreement that an inventor is permitted to experiment on his invention after reducing it to reality (the end of phase two of our model) without encountering the 'on sale' or 'in public use' bars, so long as the experimentation is his primary objective and it is reasonably necessary for demonstrating the device's utility and its lack of need for further refinement. By saying this phase three experimentation occurs subsequent to the 'reduction to practice,' the cases in the General Motors Corp. v. Bendix Aviation Corp. line are merely using the lay definition of the term, equating it with the end of phase two of our model. Despite the differences in terminology, the result under either line of cases is the same: an inventor is permitted a reasonable amount of experimentation in phase three during which a placing on sale or a public use will not bar the patent under 102(b), so long as the public use or sale is only incidental to the experimentation. We are in agreement with the Second Circuit's view of the matter.
 
 
 53
 There are occasional expressions in the books which read as though the period of experiment is only that during which the inventor is trying to reduce the invention to a stable form, to adapt it completely to its purposes: but we should hesitate to hold that his privilege is so limited. For example, in Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000, it did not appear that Nicholson, the inventor, delayed for any other reason than to learn how well his pavement would wear; apparently it was already as good as he hoped to make it. At any rate we shall assume that an inventor may wait longer, may wait until he learns whether his invention is of enough value to justify an application for a patent. On this view he may test it, not only to put it into definitive form, but to see whether his ideas are worth exploiting.
 
 
 54
 Aerovox Corp. v. Polymet Manufacturing Corp., 2 Cir. 1933, 67 F.2d 860, 862 (L. Hand, J.). See also, 2 Deller's Walker on Patents, 145 (2d ed. 1964).
 
 
 55
 There are thus two lines of authority leading to the same result. The first, adopting the legal definition, holds that 'reduction to practice' does not occur until the inventor has had a reasonable time after reduction of the invention to reality (i.e., after the end of phase two) to experiment. Curing this period, an incidental public use or sale will not bar the patent. The second line, equating 'reduction to practice' with the initial reduction of the invention to reality, permits a subsequent experimental period of reasonable duration. It would be possible to juxtapose the first line's prohibition of post-reduction-to-practice experimentation with the second's definition of 'reduction to practice' and arrive at the rigid rule that there can be no experimental period after the first working model or prototype has been constructed. This, in effect, would read out of the law the reasonable period of phase three experimentation sanctioned under either line of cases. Appellees apparently argue that we should adopt such a rule. A case illustrative of this approach is Cali v. Eastern Air Lines, Inc., E.D.N.Y.1970, 318 F.Supp. 474, rev'd, 2 Cir. 1971, 442 F.2d 65. The district court invalidated the patent becasue it was in public use prior to the critical date and rebuffed the inventor's experimental use argument, since the invention was fully developed when use, and the tests concerned only the practical utility of either of two methods of carrying out the principle of the invention. In terms of our model, phase two was complete, and the 'experimentation' was only for the purpose of demonstrating the invention's utility and completeness. Thus, the district court effectively drew the line for the completion of permissible experimentation at the end of phase two. In reversing, the Second Circuit stated,
 
 
 56
 At the threshold, we differ with the district court's interpretation of the scope of the 'experimental use' exception. Judge Dooling appears to have believed that even Pan Am's 'first use' of the tie rod and weld was not predominantly experimental even assuming that the primary purpose of the use was to determine whether Cali's idea should be adopted or rejected. Apparently the district court assumed that a use may not be 'experimental' if the purpose is to see if the idea in question has any value at all, rather than to explore ways of improving the invention or 'to determine or guide the direction of modification of an emergent inventive concept.' 318 F.Supp. at 477. The district court appears to have equated 'experimental' with 'developmental.' Id.
 
 
 57
 This conception of the scope of the experimental use exception apparently underlay the whole of the district court's decision. We find it unduly restrictive. We see no good purpose in attempting to distinguish sharply between experimentation with an eye to going 'back to the drawing board' for modification and rethinking in the event of initial failure on the one hand and experimentation directed more toward discovering whether a novel invention should be adopted and marketed or discarded in its entirety. Indeed, we have previously said as much in Aerovox Corp. v. Polymet Mfg. Corp., 67 F.2d 860, 862 (2d Cir. 1933) where we 'assumed' that an inventor may experiment with an idea 'not only to put it into definitive form, but to see whether his ideas are worth exploiting.'
 
 
 58
 The leading case difining the reach of the experimental use exception, Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1877) involved experimentation to test the durability of the inventor's new kind of pavement. There was no indication that the inventor put the pavement to the test of six years' public wear to determine what improvements he might make, rather than simply to discover whether the idea was worth pursuing. Indeed, the Court's decision in favor of the patentee was premised on the assumption that the aim of the test might be 'to bring his invention to perfection, or to ascertain whether it (would) answer the purpose intended.' 97 U.S. at 137. Either sort of experimental use-- if indeed any such sorting is tenable-- would bring the invention within the experimental use exception because 'it is the interest of the public, as well as (of the inventor) that the invention should be perfect and properly tested. * * *' Id.
 
 
 59
 422 F.2d at 70-71. We are in full agreement with this formulation of the permissible extent of the experimental period.
 
 
 60
 Appellees argue that the experimental period must have ended before the signing of the Synfoam license because the invention was by then functional for public use purposes because it could perform the general function for which it was developed. This argument, if accepted, would also read out of the law any permissible experimentation during phase three, since by definition, an invention is a functioning reality at the end of phase two. Such a rigid rule is not the law, and we reject the argument.
 
 
 61
 There are, it is true, occasional statements in the books that seem to lend support to appellees' argument. In Atlas v. Eastern Air Lines, 1 Cir. 1962, 311 F.2d 156, the court rejected the inventor's argument that his invention could not have been in public use because it was not yet fully developed. The court said,
 
 
 62
 The thrust of plaintiff's argument in this court is that the type of device represented by the American Airlines instrument has not been fully perfected and was still the subject of further refinements. However, the rule is that an invention is deemed functional for public use purposes when it can perform the general function for which it has been developed, even though the device might later be refined.
 
 
 63
 Id. at 162. In Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118, 1123, we noted that
 
 
 64
 the courts have generally construed the term 'public use' broadly. The Sixth Circuit, for example, has said that, generally, any nonsecret use of a completed and operative invention in its 'natural and intended way' is a public use.
 
 
 65
 In Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 20, 59 S.Ct. 675, 684, 83 L.Ed. 1071, the Court stated
 
 
 66
 The ordinary use of a machine or the practice of a process in a factory in the usual course of producing articles for commercial purposes is a public use.
 
 
 67
 In National Biscuit Co. v. Crown Baking Co., 1 Cir. 1939, 105 F.2d 422, 425, it was said that
 
 
 68
 the burden of avoiding the effect of a prior public use or sale by showing that the device used or sold was not complete or perfect, or, in other words, commercially inoperative, but was perfected through experiments made while in use during commercial operation, is on the plaintiff and must be shown by strong and convincing proof.
 
 
 69
 These cases, however, do not stand for the proposition that experimentation during phase three may not excuse a public use or sale. The courts instead were focusing on experimentation which results in changes furthering the development of the invention, experimentation which by definition occurs during phase two of our model, before a finished working prototype embodying the claims of the later patent exists in objective form. Of course there can be no public use or sale of the invention during phase two, but, strictly speaking, this is not by operation of the experimental use exception. Rather, there can be no public use or sale because there cannot be any use or sale of the invention at all, since it is not yet in existence but is merly in an incomplete stage of development. The possibility of public use or sale does not even arise until the end of phase two: before that, the invention is not yet 'functional for public use purposes.'
 
 
 70
 Thus, the court in Atlas was responding to the inventor's argument that the invention was not fully developed, i.e., that phase two had not ended, rather than to the argument that the use of the fully developed invention was primarily experimental. In Kardulas, there was no experimental use argument made, so the court was not negating such an argument but merely pointing out that an invention must be 'completed' and 'operative' before there can be a public use of it. Of course, an invention is not 'completed' and 'operative' until phase two has ended. The same is true of Electric Storage Battery. The strongest support for appellees' position is provided by National Biscuit Co., where the court did seem to be limiting the experimental use exception to experiments which result in change and development of the invention-- phase two experimentation. Such a rule would be at odds with the controlling Supreme Court pronouncement, which clearly permits experiments that do not result in further change-- phase three experimentation.
 
 
 71
 When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it or not. His experiments will reveal the fact whether any and what alterations may be necessary. If durability is one of the qualities to be attained, a long period, perhaps years, may be necessary to enable the inventor to discover whether his purpose is accomplished. And though, during all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experiment; and no one would say that such a use, pursued with a bona fide intent of testing the qualities of the machine, would be a public use, within the meaning of the statute.
 
 
 72
 City of Elizabeth v. American Nicholson Pavement Co., 1878, 97 U.S. 126, 134-135, 24 L.Ed. 1000, 1004. Faced with this possible conflict, we of course follow the Supreme Court's view.
 
 
 73
 As the Second Circuit noted in Cali, supra, courts have not distinguished between phase two developmental experiments and phase three experimentation and testing for purposes of the experimental exception. The theoretical bases of the exception, however, are different for the two phases. If the invention is still in phase two, the possibility of a public use or sale has not yet even arisen, since there does not exist in final form a working prototype that could be publicly used or sold. On the other hand, if the invention has passed into phase three, it has existence as an objective reality, and it could be publicly used or sold. However, such a public use or sale will be excused if the invention is still undergoing experimentation that is reasonably necessary to test its utility or to determine whether further refinement is needed. Thus the fact that an invention is no longer undergoing phase two developmental experimentation does not necessarily negate the fact that it may still be in the 'experimental period' sufficient to excuse a public use or sale. Therefore, the fact that Leesona's inventions may have been functional for public use purposes, even if established or admitted, would not preclude a finding of experimental use, if that could be established by sufficient evidence.
 
 
 74
 In sum, the most that was decided in the Canadian litigation was the point in time when phase two ended. Leesona cannot be estopped by either argument or judgment in that case to try to establish phase three experimentation sufficient to avoid the 102(b) bars in this case. Indeed, Leesona argues with force that it has not changed its position, since an earlier end to phase two would not be inconsistent with phase three experimentation that might have extended past the critical date. It was error for the district court to hold Leesona estopped to attempt to establish its experimental use theory.
 
 The Synfoam License
 
 75
 Appellees argue that the license itself is sufficient to prove that the invention was on sale and to show that the experimental period was over, since it contained no requirement of reporting back to Leesona testing results and did not restrict Synfoam from putting the invention into commercial production. They argue that any license to use an invention in return for a share of profits is a commercial, competitive use of the invention, 'disconnected from and unnecessary to the legitimate perfection of the device by experimental means.' Koehring Co. v. National Automatic Tool Co., 7 Cir. 1966, 362 F.2d 100, 104.
 
 
 76
 It is true that the license, as a bilateral contract, may be conclusive regarding the parties' legal rights and duties. It must be stressed, however, that the experimental use issue is a question not of legal relations but of fact, depending, as it does, on the inventor's state of mind. Smith & Griggs Manufacturing Co. v. Sprague, 1887, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; Lanham v. Southern Bakeries Co., 5 Cir. 1961,295 F.2d 816, affirming and adopting opinion of Lanham v. Southern Bakeries Co., N.D.Ga.1960, 198 F.Supp. 926; Solo Cup Co. v. Paper Machinery Corp., E.D.Wis. 1965, 240 F.Supp. 126, modified on other grounds, 7 Cir. 1966, 359 F.2d 754. Thus, even if the terms of the license sufficiently establish that the inventions in issue were on sale prior to the critical date (a point which Leesona attempted to dispute), the question of experimental use would remain, since a sale of the invention, if primarily for experimental purposes, does not place the invention 'on sale' within the meaning of the statute. Adams v. Columbus Manufacturing Co., Md.Ga.1960, 180 F.Supp. 921. Indeed, even in the Koerhing case cited by appellees, the court did not hold that every commercial exploitation of the invention prior to the critical date necessarily invalidates the patent. Instead, the court specifically adhered to the accepted practice by holding that a showing of a commercial exploitation merely shifts the burden to the inventor to prove that the purpose was primarily experimental.
 
 
 77
 Once a single use of an operative device embodying the invention prior to the critical date has been shown, the inventor must carry the burden of proving that the use was part of a bona fide program of experimentation. Atlas v. Eastern Air Lines, Inc., 311 F.2d 156, 160 (1st Cir. 1962), cert denied, 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963); Randolph v. Allis-Chalmers Mfg. Co., 264 F.2d 533, 536 (7th Cir. 1959). This burden is not sustainable on the record before us.
 
 
 78
 Koehring Co. v. National Automatic Tool Co., 7 Cir. 1966, 362 F.2d 100, 104. Thus, whatever its wording, the Synfoam license in itself cannot conclude the experimental use issue.
 
 
 79
 Appellees urge adoption of the Ninth Circuit's Robbins rule, which is as follows:
 
 
 80
 A sale or an offering for sale precludes any inquiry into the experimental nature of the sale unless the contract of sale or the offering for sale contains an express or clearly implied condition that the sale or offering is made primarily for experimental use.
 
 
 81
 Thus the sale or offering would not ipso facto invalidate the patent nor preclude further inquiry into the experimental nature of the use where the contract or the offer stated that the sale was for experimental purposes. (Austin (Austin Machinery Co. v. Buckeye Traction Ditcher Co., 6 Cir., 13 F.2d 697) and Ushakoff (Ushakoff v. United States, 327 F.2d 669, 164 Ct.Cl. 455), supra); or showed that the device was still experimental and that no workable prototype had been made (Amerio Contact Plate Freezers v. Belt-Ice Corp., 9 Cir., 316 F.2d 459), supra); or required that the invention should be kept confidential or from public view, or that reports on the use of the invention should be supplied to the inventor (Ajem Laboratories (Ajem Laboratories v. C.M. Ladd Co., 6 Cir., 424 F.2d 1124), Cataphote, and Piet (Piet v. United States, D.C., 176 F.Supp. 576), supra); or other similar statements appeared from which it could clearly be implied that the sale or the offering was made for an experimental purpose.
 
 
 82
 In cases where the exceptions did not appear in the sale or offering for sale, summary judgment would be permissible and proper. If the exceptions did appear, then a trial on the merits could dispose of exceptions made fasely or collusively and, generally, the merits of the claimed exceptions.
 
 
 83
 Where there has been commercial exploitation, the courts have generally found there was 'public use' and not experimental use. Smith & Griggs Mfg. Co. and FMC Corp. (FMC Corp. v. F. E. Myers & Bro. Co., 6 Cir., 384 F.2d 4), supra. But even in case of a sale where the real purpose was experimentation, the patent is still valid. Watson v. Allen, supra. Thus obtaining some monetary return from a sale made primarily for experimental purposes may not constitute in every case a 'commercial exploitation' which invalidates the patent.
 
 
 84
 Under this rule, where there was some commercial exploitation, a showing that a sale or offering for sale was conditioned upon experimentation would preclude summary judgment against patentability. The court could then hear proof on the merits and determine whether the case came within the experimental exception.
 
 
 85
 Robbins Co. v. Lawrence Manufacturing Co., 9 Cir. 1973, 482 F.2d 426, 433-434; Micro-Magnetic Industries, Inc. v. Ardac, Inc., 9 Cir. 1973, 488 F.2d 770. In our view, such a rule merely lays a trap for the unwary. It could work injustice by preventing proof of a primarily experimental use merely because an inventor or his counsel had inadvertently neglected to include sufficient indication of experimentation within a sales contract or offer. We regard the rule as excessively rigid, and we expressly decline tl adopt it. An inventor should be free to introduce evidence of a bona fide experimental intent even if that intent is not indicated within a contract of sale or offering.
 
 
 86
 Adequacy of Leesona's Opposition to the Motions for Summary Judgment
 
 
 87
 Appellees argue that the summary judgment should be upheld even though the district court erred in relying on collateral estoppel, since Leesona failed to point out in detail admissible evidence that tended to create any material fact issues for trial. We are bound to read Leesona's Memorandum in Opposition most favorably to Leesona. United States v. Diebold, Inc., 1962, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176; Poller v. Columbia Broadcasting System, Inc., 1962, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458; Jones v. Borden Co., 5 Cir. 1970, 430 F.2d 568. Giving it such a reading, it is clear that it does identify specific evidentiary matter putting material facts in issue. There is considerable direct deposition and Canadian trial testimony, both from the Permatwist partners and from others, indicating that experiments were performed on the Synfoam machines, that reports were made to the Permatwist partners on the result, and that changes in the machines actually resulted from this experimentation.[6] All of this might provide sufficient basis for a reasonable belief that the experimental period lasted past the critical date.
 
 
 88
 The district court characterized this testimony as nothing but 'self-serving comments of the inventors' and held that it was 'really no evidence at all.' In so holding the court violated the rule that
 
 
 89
 the trial court should be very careful . . . to avoid assessing the probative value of any evidence presented to it, for this would be an unwarranted extension of the summary judgment device. Assessment of the probative value of evidence is properly the function of the jury or the judge sitting as a trier of facts.
 
 
 90
 Gauck v. Meleski, 5 Cir. 1965, 346 F.2d 433, 436. Accord, Gross v. Southern Ry., 5 Cir. 1969, 414 F.2d 292. Questions of credibility should not normally be decided by means of summary judgment but should instead be left for the trier of fact. Croley v. Matson Navigation Co., 5 Cir. 1970, 434 F.2d 73. The court should therefore not have disregarded Leesona's evidence. Taking it into account, it is clear that Leesona succeeded in demonstrating that there existed material fact issues requiring a trial.
 
 
 91
 This case is a poor one for summary judgment in any event. The experimental use exception is basically a question of the inventor's intent. When commercialization of the invention is alleged, it requires a weighing of two motives-- experimentation and profit-- that may co-exist, because the experimental use exception applies if the experimental motive predominates.[7] We have observed before that issues involving state of mind and intent are not well suited to disposition by summary judgment, since much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder. Alabama Great Southern R. R. v. Louisville and Nashville R. R., 5 Cir. 1955, 224 F.2d 1. Most courts are in agreement that issues involving state of mind are difficult to handle by summary judgment. 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil 2730. Also, since the experimental use exception involves weighing two different subjective motives, both of which might be established by the evidence, reasonable men might draw different inferences even from the same established facts. Therefore, the issue should be resolved by the fact finder after a full hearing of all the evidence rather than by summary judgment. Croley v. Matson Navigation Co., 5 Cir. 1970, 434 F.2d 73. See also Tee-Pak, Inc. v. St. Regis Paper Co., 6 Cir. 1974, 491 F.2d 1193; Austin Machinery Co. v. Buckeye Traction Ditcher Co., 6 Cir. 1926, 13 F.2d 697, cert. denied, 1927, 273 U.S. 747, 47 S.Ct. 448, 71 L.Ed. 871 (reversing a judgment of patent invalidity for prior public use or sale on the ground that the district court drew the wrong inferences from the established facts); Micro-Magnetic Industries, Inc. v. Ardac, Inc., 9 Cir. 1973, 488 F.2d 770.
 
 
 92
 Reversed and remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Our model describes typical steps for an invention that is actually reduced to practice, since that is the case before us. It does not apply to constructive reduction to practice. See The Legally Complete Invention-- A Study of the Requirement of Testing to Establish an Actual Reduction to Practice, 33 Geo.Wash.L.Rev. 740 (1965); New Guidelines for Applying the On Sale Bar to Patentability, 24 Stan.L.Rev. 730 (1972)
 
 
 [2]
 He later found the date of invention for the method of processing the yarns to have been at least as early as November 13, 1950
 
 
 [3]
 The rule provides as follows:
 Motions for summary judgment shall be accompanied by a memorandum of law, necessary affidavits, stamped addressed envelopes for notice, and a concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment shall include a memorandum of law, necessary affidavits, and a concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the opposing party's statement.
 
 
 [4]
 See, however, the discussion of that issue infra
 
 
 [5]
 In rare instances, the invention might be so simple that its practical utility would be obvious even without any testing. In such cases, the two dates would coincide. The inventions before us are not in this small class
 
 
 [6]
 Although an invention may still be in the experimental period even though the experiments do not result in any changes, the fact that changes do result lends additional support to the experimental use theory
 
 
 [7]
 Some cases have loosely said that the experimental use exception applies only if experimentation was the inventor's sole motivation. Dart Industries, Inc. v. E.I. DuPont De Nemours and Co., 7 Cir. 1973, 489 F.2d 1359; Minnesota Mining and Manufacturing Co. v. Kent Industries, Inc., 6 Cir. 1969, 409 F.2d 99. With deference, we must say that this misstates the law. The Supreme Court has made it clear that the experimental use exception applies, despite the presence of a profit motive, if experimentation is the inventor's dominant purpose, and this rule has never been directly questioned. Smith & Griggs Manufacturing Co. v. Sprague, 1887, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; Watson v. Allen, 1958, 103 U.S.App.D.C. 5, 254 F.2d 342; Lanham v. Southern Bakeries Co., 5 Cir. 1961, 295 F.2d 816