Stanley D. **STEARNS** and James A. Ramin, Plaintiffs-Appellants,

v.

**BECKMAN INSTRUMENTS, INC.,** Defendant-Appellee.

No. 81–2090.

United States Court of Appeals, Fifth Circuit.

March 12, 1982.

---

Donald Gunn, Houston, Tex., for plaintiffs-appellants.

Garrett R. Tucker, Jr., Martin L. McGregor, Houston, Tex., for defendant-appellee.

Before THORNBERRY, TATE and WILLIAMS, Circuit Judges.

THORNBERRY, Circuit Judge:

In this patent appeal, the holders of a patent—United States Patent No. 4,022,065 —contest the district court's grant of summary judgment invalidating the patent under the "on sale" bar of 35 U.S.C. § 102(b). Because we agree with the patent holder that a genuine issue of material fact existed concerning the "on sale" status of the patented invention, we reverse the district court and remand for trial.

## I. The Case Below

Appellants invented and manufactured a sample measuring syringe for use in the laboratory testing of minute quantities of chemicals. Approximately one year later, on February 19, 1976, they applied for and

received a patent on this device. In 1979, they learned that Beckman Instruments was manufacturing a substantially similar syringe, so they filed suit in district court alleging direct patent infringement. The district court, however, granted summary judgment for Beckman Instruments and invalidated appellants' patent because of the statutory "on sale" bar, which requires the patentee not to sell or offer commercially an invention for more than one year before seeking a patent.[1] Specifically, the district court found, as appellants conceded, that appellants had sold one of the devices before the critical date of February 19, 1975; the court rejected the appellants' defense that the device sold was exempted from the "on sale" bar because the device was only a faulty prototype that did not reduce the invention to practice. The court agreed that the "on sale" bar did not apply to inventions not reduced to practice, but decided that appellants had failed to raise a genuine issue of material fact concerning the "not reduced to practice" defense. *See* 505 F.Supp. 1035 (1981). With this latter conclusion we disagree.

## II. The Invention

During a telephone conversation on or about October 29, 1974, appellants conceived the idea behind their invention. They wanted to create a syringe capable of measuring chemical test samples without having to compensate for the amount of chemical left in the internal passages of the test equipment. The syringe would accomplish this by virtue of an offset in its measurement calibrations, so that it automatically held an amount equal to the volume of the test equipment's passages in addition to the amount shown by the calibrations. Because the offset would depend on the volume of the test equipment's passages, the syringe was intended for use with a test valve and adapter built by appellants.

Appellants immediately began to construct the first prototype, but after two weeks they decided to make a radical change in the design of the syringe and adapter. On November 16, 1974, appellants sketched the new design and ordered the construction of the second prototype. Several of these second prototype syringes and adapters were manufactured, and on February 4, 1975, two of them were ordered by Dr. Silvestre Tejada of the Environmental Protection Agency for use in the Research Triangle Park laboratories. This order was received by one of appellants' authorized sales representatives, thus consummating a sale before the critical date of February 19, 1975.[2]

However, on February 11, 1975, appellants noticed that the second prototype syringes would not make accurate measurements because the large bore needle allowed air bubbles to enter with the sample. They therefore changed the syringe's specifications by reducing the inside diameter of the needle from .020 inches to .006 inches. Several of these third prototype syringes were manufactured, but they were not completed until after the critical date. Subsequently, the third prototype design became appellants' commercial product.

Appellants did not send any syringes to EPA until February 21, 1975, after they had completed the third prototype syringes. They thus could have filled EPA's order with the finally completed invention, but they sent the second prototype syringes as ordered. Dr. Tejada used the second prototype syringes and observed that these syringes made inaccurate measurements because of the air bubble problem caused by

---

1. The statutory "on sale" bar reads as follows:
   § 102. Conditions for patentability; novelty and loss of right to patent
   A person shall be entitled to a patent unless—
         *    *    *    *    *    *
   (b) the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

35 U.S.C. § 102(b) (1954).

2. The sale was clearly for commercial purposes: appellants did not condition the sale with any requirements for EPA to perform any tests with the syringes or to report any test results back to them. Thus, appellants cannot and do not claim the "experimental use" exception to the "on sale" bar.

the large bore needle. However, Dr. Tejada did not consider the problem to be serious, since he was using the syringes for qualitative analysis, which does not require accurate measurement.[3]

### III. Reduction to Practice

At trial, the district court examined all of these facts and decided that the invention had been reduced to practice in both the second and third prototypes. First, the court held that the appellants' patent did not refer to any particular needle bore size and was not limited to quantitative analysis. Thus, the second prototype's air bubble problem did not defeat the patented invention's purpose and prevent its reduction to practice. In addition, the court found that the perfection of the invention in the third prototype reduced it to practice, because it involved only the correction of an obvious defect and because the correction was begun prior to the critical date. The court therefore granted summary judgment on the "on sale" claim.

But as this Court views the same facts, there is a genuine issue of material fact concerning the invention's reduction to practice in both the second and third prototypes, so that summary judgment on the "on sale" issue was not proper.[4] We reach this conclusion not because we disagree with the district court's findings of fact, but rather because we disagree with that court's interpretation of those facts under the law of "reduction to practice."

### A. The Second Prototype

First, we think that an issue of fact existed as to whether the second prototype reduced the invention to practice. The district court erroneously found the second prototype to be functional because the patent was not limited to quantitative analysis—in other words, because the patent also

described a syringe useable for transferring unmeasured amounts of chemicals for qualitative analysis. Thus, according to the district court's reasoning, the second prototype's air bubble problem did not prevent it from reducing the invention to practice. This reasoning, however, reads the patent and the law of "reduction to practice" too narrowly.

"[A] patent is to be construed as a contract, with the intent of the parties as the lodestar. It is the real invention claimed and granted protection which we seek to determine." *Laitram Corp. v. Deepsouth Packing Co.*, 443 F.2d 928, 933 (5th Cir. 1971). Using this reasoning, we think that appellants' patent should be read more realistically as a claim for a quantitative measuring device alone, not for a quantitative and qualitative device. Of course, any syringe, including appellants' patented one, *can* be used to transfer variable, approximately measured amounts of chemicals to the testing equipment, thus making it useful for qualitative analysis. But the very reason for the existence of appellants' patent is its unique method for making accurate measurements: the calibrations on the syringe have been offset to compensate for the quantity of chemical sample that remains in the internal passages of the test equipment after injection. Indeed, the district court admits as much when it notes that "[t]he critical element of the patent was the 'offset' of the syringe calibration scale to compensate for the volume of sample which is not transferred into the column, but remains in the valve after it has been actuated." The "Background of the Invention" statement contained in the patent also explains this quantitative purpose. Although the claims of the patent do not specifically limit the patent to any purpose,

---

3. Indeed, qualitative analysis, which tests a chemical sample only to determine what chemical elements and compounds it contains, requires no more than a device that can transfer approximate and even unmeasured amounts of the sample to the test equipment. Quantitative analysis, on the other hand, tests a chemical sample for the amounts of its constituent elements and therefore requires a device that can

deliver exact amounts of the sample to the test equipment.

4. Of course, in reviewing a motion for summary judgment, this Court looks at the record in a light most favorable to the party opposing the motion. *Walters v. City of Ocean Springs*, 626 F.2d 1317, 1322 (5th Cir. 1980).

they do reveal the quantitative purpose when construed in light of the common knowledge of a person skilled in the art of chemical analysis. Thus, appellants' patent should not be read to include a claim for a qualitative analytical device.

When the patent is read in this way, the law of "reduction to practice" seems to dictate a conclusion different from that reached by the district court. In other words, a device intended for quantitative analysis does not seem reduced to practice when it cannot make accurate measurements. As this Court held in *In Re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 280 (5th Cir. 1974), *cert. denied sub nom. Sauquoit Fibers Co. v. Leesona Corp.*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974), " 'reduction to practice' includes not only [the] reduction [of an idea] to reality but also sufficient testing or experimentation to demonstrate that the device as it exists possesses sufficient utility to justify a patent, i.e., *that the invention is suitable for its intended purpose.*" (Emphasis added)[5] Appellants' syringe in the second prototype did not seem to possess sufficient utility to justify a patent or to be suitable for its intended purpose; it may not have been a "functioning reality" or a reality that could "perform the general function for which it was developed," as defined in *In Re Yarn Processing. See* 498 F.2d at 283. In short, the syringe's

measuring problem may have defeated the idea behind the invention. Appellants' testimony on this issue cannot be entirely disregarded, because "[a]ssessment of the probative value of evidence is properly the function of the jury or the judge sitting as a trier of facts," not of the court for summary judgment. *Id.* at 287.[6] And when combined with Dr. Tejada's problematic deposition testimony, it certainly raises an issue of material fact sufficient to preclude summary judgment.

### B. The Third Prototype

In addition, we do not think that the third prototype reduced the invention to practice. Although the third prototype later proved to be a successful device, it was not completed before the critical date. The parties cite no cases from this Circuit allowing exceptions to the general rule that uncompleted articles are not reduced to practice, and the evidence does not seem to support the application of such an exception here even if we accept the cases from other Circuits. *See generally* the cases discussed in Annot., 25 A.L.R.Fed. 486, at § 11 (1975). Appellants' finalized design had not been unequivocally offered for sale as a satisfactory product: they had ordered the construction of only six third-prototype syringes and intended to display these later at a trade show, but they had not begun any sales.[7] This evidence simply does not seem strong enough to impose the "reduced to

---

5. In *In Re Yarn Processing* this Court also observed that "[i]n rare instances, the invention might be so simple that its practical utility would be obvious even without any testing." 498 F.2d at 279 n.5. Appellants' device limited to its quantitative purpose may not fall within this "small class" of such "simple" inventions—after all, the reduction to practice rule is meant to allow the inventor to prove that his idea can be made to work well enough to justify a patent.

6. Summary judgment is even less appropriate in actions involving the intent of the parties. Wright & Miller, Federal Practice and Procedure: Civil § 2730 (1973). In this case, intent is clearly relevant in construing the patent. It may also be relevant in determining whether the invention was reduced to practice.

   Concerning this latter point, the district court found that no issue of fact existed as to appellants' intent because they introduced evidence

only of appellant Stearns' intent, not of appellant Ramin's (and because Ramin's company actually sold the second prototype to EPA). But we think that the intent of coinventors may be imputed to each other, at least to the extent of raising a fact issue as to their intent regarding reduction to practice. Thus, summary judgment should not have been used.

7. Of course, the third prototype resulted from a rather simple modification of the second prototype, and thus it may be viewed as a completion of the idea offered for sale in the second prototype model. But the evidence of a "freeze" in the design before the critical date does not seem sufficient to allow summary judgment on the reduction to practice of an untested invention intended for quantitative analysis alone, as this Court reads appellant's patent.

practice" label on the uncompleted third prototype, at least not in summary judgment.

### IV. Conclusion

Because this Court reads the patent to be different from the district court's reading and because we find evidence of factual disputes concerning the reduction to practice of both the second and third prototypes, we must reverse the district court's summary judgment. We do not, however, reach any conclusion regarding the merits of this case; instead, we leave such a decision to the wisdom of the district court after it has fully heard the case.

REVERSED AND REMANDED.