**Stanley D. STEARNS and James A. Ramin, Plaintiffs,**

v.

**BECKMAN INSTRUMENTS, INC., Defendant.**

Civ. A. No. H–79–1932.

United States District Court, S. D. Texas, Houston Division.

Jan. 22, 1981.

Gunn & Lee, Donald Gunn, Houston, Tex., for plaintiffs.

Baker & Botts, Garrett R. Tucker, Jr., Houston, Tex., for defendant.

## MEMORANDUM AND ORDER:

STERLING, District Judge.

Pending before the Court is Defendant, Beckman Instruments, Inc.'s motion for summary judgment. Pursuant to the Court's Order of September 29, 1980, Defendant's motion for a separate trial of the "on sale" issue was interpreted as a motion for summary judgment.

This is an action for alleged infringement of United States Patent No. 4,022,065 [hereinafter the '065 patent] in which Plaintiffs, the co-inventors of said patent, allege that Defendant has directly infringed the '065 patent. Plaintiffs' Original Complaint at 2. Defendant, Beckman Instruments, Inc. [hereinafter Beckman] maintains that the '065 patent is invalid and void by reason of the statutory bar of 35 U.S.C. § 102(b), because the subject matter thereof was "on sale" in this country more than one year prior to the date the application for the patent was filed.

■ Under 35 U.S.C. § 102(b) a single public use or sale more than one year prior to the date of application for a patent will invalidate the patent. *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 277 (5th Cir.), *cert. denied sub nom., Sauquoit Fibers Co. v. Leesona Corp.*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); *Borden, Inc. v. Occidental Petroleum Corp.*, 381 F.Supp. 1178, 1206 (S.D.Tex.1974). An invention may be placed "on sale" within the contemplation of 35 U.S.C. § 102(b) by the inventor or another, with or without the inventor's consent. *Hobbs v. United States Atomic Energy Commission*, 451 F.2d 849, 860 (5th Cir. 1971). Actual delivery of the invention is not essential to raise the bar, all that is required is that the invention be reduced to practice in the sense that it is beyond the stage of experimentation and that a sales contract exist. *In re Yarn Processing Patent Validity Litigation, su-*

pra, at 277. *Hobbs v. United States Atomic Energy Commission, supra*, at 859. Consequently, the statutory bar does not apply if the invention has not been reduced to practice.

■ Usually mere construction of a device without testing or experimentation is insufficient to reduce it to practice. However, a device can be reduced to practice without testing and experimentation if it is so simple that satisfactory operation is obvious. *In re Yarn Processing Patent Validity Litigation, supra*, at 281. Reduction to practice does not require that the device embodying the invention be mechanically perfect or in a commercially marketable form. Id.; *Kardulas v. Florida Machine Products Co.*, 438 F.2d 1118, 1121 (5th Cir. 1971).

■ The statutory bar of 35 U.S.C. § 102(b) is not invoked if the sale was primarily for the purposes of experimentation. A sale of the invention for experimental purposes to enable the inventor to determine whether the invention is complete does not place the invention "on sale" within the meaning of the statute. *In re Yarn Processing Patent Validity Litigation, supra*, at 277. The "experimental use" defense is basically a question of the inventor's intent. Id. at 288.

■ To establish public use or sale under § 102(b), the defendant in an infringement suit has a heavy burden of proof, which must be clear and convincing, a mere preponderance of the evidence is insufficient. *Kardulas v. Florida Machine Products Co., supra*, at 1124; *Borden v. Occidental Petroleum Corp., supra*, at 1206. However, once a prima facie case of public sale has been made the burden of going forward shifts to the plaintiff, who then must demonstrate that the use was experimental or that the device was not functionally operative. If the plaintiff fails to make such a showing, the invention is deemed to have been dedicated to the public and therefore unpatentable. *DeLong Corp. v. Raymond International, Inc.*, 622 F.2d 1135, 1144 (3d Cir.

1980); *Dunlop Co. Ltd. v. Kelsey-Hayes Co.*, 484 F.2d 407, 413 (6th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974); *F.M.C. Corp. v. F. E. Myers & Bro. Co.*, 384 F.2d 4, 40 (6th Cir. 1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); *Atlas v. Eastern Air Lines, Inc.*, 311 F.2d 156, 160 (1st Cir. 1962), *cert. denied*, 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963); *see, Strong v. General Electric Co.*, 434 F.2d 1042, 1044 (5th Cir. 1970), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2207, 29 L.Ed.2d 681 (1971).

■ On a motion for summary judgment, if the patent holder raises the "experimental use" or "not reduced to practice" defenses, the burden is on the alleged infringer to establish that no genuine issue of material fact exists with respect to such defense and that he is entitled to judgment as a matter of law. *DeLong Corp. v. Raymond International, Inc., supra*, at 1144. In determining the existence of a material fact issue, the record as a whole and the factual inferences must be viewed in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). If the alleged infringer makes a showing entitling him to judgment the burden shifts to the patent holder to come forward with controverting proof. In the absence of evidence to the contrary, the presumption is that the invention covered by the patent had been reduced to practice and was suitable for commercial exploitation. *DeLong Corp. v. Raymond International, Inc., supra*, at 1144.

Plaintiff herein has raised the "not reduced to practice" defense to the "on sale" bar asserted by Defendant. There is no assertion that the sale made in this case was for experimental purposes.

The undisputed facts of this case are:

1. Conception of the invention in question occurred during a telephone call between Messrs. James A. Ramin and Stanley D. Stearns on or about Tuesday, October 29, 1974. Ramin Deposition at 131–132. After Mr. Ramin made a preliminary sketch of the syringe and adapter, construction of the first prototype was begun on October 30, 1974. *Id.* at 405–06. After some two weeks of discussion and experimentation, Ramin and Stearns decided to radically change the design of the syringe and adapter. *Id.* at 416.

2. On November 16, 1974, Ramin sketched the design for the second "prototype" with a big bore needle. *Id.* at 416. He also directed the shop superintendent to manufacture a syringe pursuant to the sketch. *Id.* Exhibit 16 at 1–2. This syringe was intended for use with a specific Valco valve, and the calibration scale was "offset" by a calculated amount to compensate for the "hold up" volume of sample remaining in the valve. The syringe had a 21 gauge needle, it was .750 of an inch long and had an inside diameter of approximately .020 of an inch. Several of these "second prototype" syringes were made up.

3. On or about February 4, 1975, the Environmental Protection Agency [hereinafter EPA] at Research Triangle Park, North Carolina, placed a telephone order with Glenco Scientific, Inc. for "2 Ea SP 19909–10–VI Special Syringe 10 ul with adapter to fit directly on valve." This order was taken on behalf of Glenco by Wayne Brown, an inside salesman authorized to receive telephone orders. Ramin Deposition at 349.

4. The two Glenco SP–19909–10–VI syringes and adapters ordered by the EPA were shipped to the EPA by Glenco on February 21, 1975. The EPA paid Glenco for the two syringes and adapters on or shortly after March 5, 1975. *Id.* at 356.

5. The sale by Glenco of the two SP 19909–10–VI syringes and adapters to the EPA was unrestricted in that the purchaser was not required by the seller to perform any tests with the equipment or furnish test data to the seller. *Id.* at 52–53.

6. On February 11, 1975, following a discussion between Stearns and Ramin respecting the "second prototype", Ramin changed the specifications for the syringe, reducing the outside diameter of the needle from 21 gauge to 22 gauge or from .033 to about .028 of an inch, and reducing the

inside diameter or bore of the needle to .006 of an inch. *Id.* at 417–18. These changes were initiated because it was obvious to Stearns, on examination of the "second prototype", that "the needle was much too large in the bore, and would be very difficult to fill." *Id.* at 420. On that same date, Ramin ordered that six of the "third prototype" syringes be made up. Seven of these syringes were completed on February 20, 1975. *Id.* at 418–28. Consequently, the "third prototype" syringes were in the process of manufacture on the critical date of February 19, 1975.

7. No changes were made in the specifications for the Glenco valve injection syringe subsequent to February 11, 1975. The "third prototype" became Glenco's commercial product, designated initially as "SP 19909–10" and later as "VIS–10–7000." *Id.* at 519. There is no indication that tests or experiments were run on the "third prototype" prior to its sale. The EPA order could have been filled by the "third prototype".

8. The EPA received the "second prototype" syringe with the larger gauge and bore. This syringe embodied all the claims of the '065 patent. It differed from the syringe that became "VIS–10–7000" only in the bore and gauge of the needle. There is nothing in either the specifications or claims of the '065 patent respecting the gauge or bore of the syringe needle. The syringes sold to the EPA and Glenco's "VIS–10–7000" syringe possess the same degree of "offset" of the calibration scale which is .2187 of an inch. *Id.* at 388, 399 and 403.

9. Dr. Silvestre B. Tejada at the EPA had some difficulty in filling Glenco's "second prototype" because of air bubbles entering the syringe. This "air bubble" problem resulted from the large bore needle. Tejada Deposition at 77. However, Dr. Tejada did not consider the "air bubble" problem to be very serious as he was doing "qualitative" analysis as opposed to "quantitative" analysis. The purpose of qualitative analysis is to determine the elements present in a sample. Quantitative analysis determines the amount of a specific element in a sample.

10. The application for the '065 patent was filed on February 19, 1976. Therefore, the critical date for purposes of the "on sale" bar is February 19, 1975.

11. The patented combination of the '065 patent comprises three elements: (1) a sample injection valve, (2) a syringe with an "offset" calibration scale, and (3) a fitting or adapter which is screwed into the inlet part of the valve and into which the needle of the syringe is inserted to make a leak-proof seal. Ramin Deposition at 66–68 and 112–25. The critical element of the patent was the "offset" of the syringe calibration scale to compensate for the volume of sample which is not transferred into the column, but remains in the valve after it has been actuated. '065 Patent, at Col. 2, lines 3–8.

12. Both Valco, Plaintiff Stearns' Company and Glenco, Plaintiff Ramin's Company, had been selling sample injection valves manufactured by Valco, which were similar in all respects to the valve shown in the '065 patent, long prior to the critical date. Ramin Deposition at 151 and 254; Stearns Deposition at 79 and 83. Consequently, of the elements claimed in the '065 patent, only the syringe and its adapter could be considered as new innovations.

13. The '065 patent is not limited to quantitative analysis.

There is no issue as to "identity" in this case. It is clear from the record that the Glenco syringes sold to the EPA and Glenco's subsequently marketed "VIS–10–7000" syringe correspond in every particular to the claims of the '065 patent.

Plaintiffs seek to avoid the "on sale" bar by claiming that the syringe sold to the EPA pursuant to the February 4, 1975, order were inoperative prototypes and therefore "not reduced to practice." They assert that the larger bore of the needles and the concomitant problems with air bubbles rendered these syringes inoperable. The sample injection valve and adapter mechanism for the syringes sold to the EPA functioned

as they were designed to function and there is no issue as to their operability or reduction to practice.

The Court is of the opinion that the essential feature of the '065 was the offset calibration and that this was so simple a concept that it did not require testing or experimentation to know that it would function in a satisfactory manner. This concept was reduced to practice with the construction of the second prototype syringe, which was purchased by the EPA. Even if the concept had not been reduced to practice with the construction of the second prototype, then it would have been reduced to practice on February 11, 1975, when Stearns noticed that the bore of the needle was too large and Ramin ordered construction of the syringes that became the VIS–10–7000 series. The large bore needle was an obvious defect that Stearns noticed immediately. However, the Court is convinced that the second prototype fully reduced the invention to practice and sufficiently disclosed the nature of the invention to enable one skilled in the art to practice it. *See, Kardulas v. Florida Machine Products Co.*, 438 F.2d 1118, 1121 (5th Cir. 1971). The device as embodied in the second prototype was not commercially refined but the offset calibration concept functioned.

Plaintiffs further contend that reduction to practice is largely a matter of mental intent on the part of the inventors and that mental intent is always a fact issue which should not be determined on a motion for summary judgment. However, the Court is of the opinion that mental intent as to reduction to practice does not preclude summary judgment where, as here, Plaintiffs have not established that there is a material fact issue with regard to their intent.

▆▆▆ Defendant has demonstrated more than a prima facie case of public sale because Plaintiffs have conceded that the sale took place. Moreover, Defendant has established that no genuine issue of material fact exists with respect to the "not reduced to practice" defense. The burden has shifted to Plaintiffs to produce significant probative evidence of the existence of a material fact issue with regard to their "not reduced to practice defense," and this they have failed to do. *See,* Fed.R.Civ.P. 56(e). On the issue of intent, all Plaintiffs have come forward with is the affidavit of co-inventor Stearns. The affidavit states that in Stearns' mind the invention disclosed in the '065 patent was not reduced to practice until on or about March 3, 1975, when it was offered for sale at the Pittsburgh Conference. Defendants have not adduced any evidence as to the mental intent of co-inventor Ramin. It was Ramin's company Glenco which sold to the EPA the "second prototype" syringe, which embodied the offset calibration concept. The Court is of the opinion that where co-inventors are concerned, an invention can be put "on sale" within the contemplation of 35 U.S.C. § 102(b) by one co-inventor even if the other co-inventor felt that it was not reduced to practice. Plaintiffs have not come forward and established that there is a material fact issue with regard to *their* intention to reduce the invention to practice. In the absence of evidence to the contrary, the presumption is that the invention covered by the patent had been reduced to practice and was suitable for commercial exploitation. In light of the above, the Court is persuaded that the invention covered by the '065 patent was "on sale" more than one year prior to the date of the application for the patent and that the patent is therefore invalid under 35 U.S.C. § 102(b). It is, therefore,

ORDERED that Defendant's motion for summary judgment is hereby GRANTED and Plaintiff's claims under the patent law of the United States are hereby DISMISSED with prejudice.